**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**JOE C. ROMERO,**

      **Plaintiff,**

   **vs.**                                        **Civ. No. 20-256  JFR**

**ANDREW SAUL, Commissioner
of the Social Security Administration,**

      **Defendant.**

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 18)[2] filed August 19, 2020, in connection with Plaintiff's *Motion to Reverse and Remand for Award of Benefits with Supporting Memorandum,* filed October 19, 2020.  Doc.  21. Defendant filed a Response on December 18, 2020.  Doc. 23.  Plaintiff filed a Reply on January 4, 2021.  Doc. 24.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and shall be **GRANTED IN PART**.[3]

### I.  Background and Procedural Record

Plaintiff Joe C. Romero (Mr. Romero) alleges that he first became disabled on November 15, 2016, at the age of 51, due to the alleged impairments of legally blind in the left

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  Docs. 6, 8, 9.

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 18), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

[3] The Court is remanding for additional administrative proceedings.

eye, carpal tunnel syndrome right wrist, arthritis, asthma, lower back tendons problem, and right leg tendons problem.[4]  Tr. 384, 388.  Mr. Romero completed high school in special education classes, and despite having a diploma does not know how to read or write.  Tr. 146, 152, 204, 209-10, 385, 389, 398, 401, 441.  Mr. Romero worked for at least fifteen years as a ditch digger and performed other general construction labor and clean up jobs until problems with his back and arms prevented him from working.[5]  Tr. 194-97, 389, 415-16.  Mr. Romero stopped working on November 15, 2016, due to his medical conditions.  Tr. 388.  Mr. Romero's date last insured is September 30, 2020.[6]  Tr. 12, 244.  Therefore, to receive disability insurance benefits, Mr. Romero must show he was disabled prior to that date.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

On January 11, 2017, Mr. Romero filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*.  Tr. 362-65.  Mr. Romero concurrently filed an application for Supplemental Security Income ("SSI") Benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*.  Tr. 366-71.  Mr. Romero's applications initially were denied on June 30, 2017.  Tr. 225, 226, 227-38, 239-50, 287-91, 292-95.  They were denied again at reconsideration on September 25, 2017.  Tr. 251, 252, 253-69, 270-86, 298-301, 302-05.  On November 13, 2017, Mr. Romero filed a written request for a hearing by an Administrative Law Judge.  Tr. 306-07.  Administrative Law Judge (ALJ) Ann Farris held a hearing on October 16, 2018.  Tr. 185-224.  Mr. Romero appeared in

---

[4] At reconsideration, Mr. Romero alleged that after the removal of his left eye in April 2017, he became very depressed, had loss of energy and enthusiasm, and was feeling worthless most days.  Tr. 437.

[5] The Work History Report completed by Mr. Romero's sister asked for a list of all jobs "in the last 15 years."  Tr. 415.

[6] To qualify for DIB, a claimant must establish that he met the statutory requirements for disability on or before his date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(c)(1); *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

person at that hearing, with representation from his sister, Doreen Romero, a non-attorney, who also served as a witness.[7][8] *Id.* The ALJ took testimony from (1) Mr. Romero, (2) impartial vocational expert (VE) Leslie J. White, and (3) Mr. Romero's sister. *Id.* On March 1, 2019, ALJ Farris issued an unfavorable decision. Tr. 8-28. Mr. Romero appealed the unfavorable decision to the Appeals Council and on February 4, 2020, the Appeals Council declined review. Tr. 1-7. On March 20, 2020, Mr. Romero timely filed a complaint seeking judicial review of the Commissioner's final decision. Doc. 1.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[9] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

---

[7] Mr. Romero is represented in these proceedings by Attorneys Gary Martone and Feliz M. Martone. Doc. 1.

[8] The ALJ first deemed Ms. Romero a representative, but later swore her in as a witness. Tr. 189-91, 207-09. Ms. Romero informed the ALJ she was confused about her role because the ALJ originally instructed Ms. Romero that she could not testify as a witness and serve as a representative, but then permitted her to do both. *Id.*

[9] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 107 S. Ct. 2287, 2294 n. 5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and

terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.    Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency.  *Langley*, 373 F.3d at 1118.

## III.  Analysis

The ALJ made her decision that Mr. Romero was not disabled at step five of the sequential evaluation.  Tr. 26-28.  Specifically, the ALJ found that Mr. Romero met the insured status requirements through September 30, 2020.  Tr. 14.  The ALJ determined that Mr. Romero

had not engaged in substantial gainful activity from his alleged onset date of November 15, 2016.  *Id.*  At step two, the ALJ determined that Mr. Romero suffered from the following severe impairments:  blind left eye with prosthesis, right shoulder osteoarthritis, status post bilateral cubital tunnel releases, osteoarthritis in hands, and lumbago with sciatica.  *Id.*  She also found non-severe physical impairments of obesity, asthma, allergies, hypertension, GERD and status post repair of umbilical hernia.  Tr. 15-16.  The ALJ further found non-severe mental impairments of depression and learning disorder.  Tr. 16-18.  At step three, ALJ Farris determined that Mr. Romero did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 18-19.  Accordingly, the ALJ proceeded to step four and assessed that Mr. Romero had the RFC to perform less than a full range of light work[10] as follows:

> He may occasionally climb stairs, balance, and stoop; Never kneel, crouch, or crawl; and occasionally handle and finger.  He has no peripheral vision on the left and no depth perception.

Tr. 19, 20-25.  ALJ Farris concluded at step four that Mr. Romero was unable to perform his past relevant work.  Tr. 26.  At step five, ALJ Farris determined that based on Mr. Romero's age, education, work experience, RFC, and the testimony of the VE, that jobs existed in significant numbers (8,300) in the national economy that Mr. Romero could perform.[11]  Tr. 26-27.  As a result, ALJ Farris found that Mr. Romero was not disabled.  Tr. 27-28.

---

[10] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[11] (1) Counter Clerk (DOT code 249.366-010, light exertion, unskilled work, with 6,900 jobs nationally); and (2) Bakery Worker (DOT code 524.687-022, light exertion, unskilled work, with 1,400 jobs nationally).

In his Motion, Mr. Romero argues that the ALJ erred in finding that 8,300 available jobs represented a significant number of jobs in the national economy.  Doc. 21 at 5-7.  Mr. Romero further argues that the ALJ failed to properly assess Mr. Romero's RFC because she (1) failed to consider Mr. Romero's statements regarding the intensity, persistence, and limiting effects of his symptoms in violation of SSR 16-3p; (2) failed to develop the record with respect to Mr. Romero's nonexertional mental limitations and should have ordered a consultative psychological exam; and (3) failed to properly consider Mr. Romero's severe vision impairment. Mr. Romero argues that the ALJ's error in finding that a significant number of jobs exist in the national economy warrants a remand for an immediate award of benefits without the need for a rehearing, and alternatively seeks a rehearing to adequately develop the record.  *Id*. at 6-7, 12.

The Commissioner contends that the ALJ reasonably determined that Mr. Romero could perform a reduced range of light work and that substantial evidence supports the ALJ's decision because Mr. Romero's eye impairment existed in large part since childhood, surgical treatments were effective for both his eye and his wrists, and he otherwise received conservative treatment in the form of medication and injections.  Doc. 23 at 6-7.  The Commissioner also contends that the ALJ summarized Mr. Romero's testimony and subjective reports and identified several reasons for finding his statements about his symptoms were less than reliable.  *Id*. at 7.  The Commissioner asserts that the ALJ was not required to order a consultative psychological examination because the record showed that medication and counseling were sufficient to stabilize Mr. Romero's symptoms of depression.  *Id.* at 8-9.  Finally, the Commissioner argues that the ALJ sufficiently addressed the limited medical record concerning Mr. Romero's vision impairment and included limitations in the RFC commensurate with the record.  *Id.* at 9.

For the reasons discussed below, the Court finds that the ALJ failed to properly consider the effect of Mr. Romero's nonexertional visual and mental impairments on his ability to do work-related activities, and failed to develop the record by ordering a consultative psychological exam. As such, this case requires remand.

### A.      <u>Relevant Medical Evidence</u>

#### 1.      <u>Visual Impairment</u>

Mr. Romero had a "rounded metallic foreign body," *i.e.*, a BB (from a BB gun incident when he was a child), lodged in his left orbit that resulted in left-sided blindness. Tr. 558-59, 595, 692. The Administrative Record demonstrates that Mr. Romero was obtaining eye care and treatment at the University of New Mexico Eye Clinic. The record here begins on June 19, 2015, when Mr. Romero reported continued left eye pain and photophobia, with redness, from a corneal abrasion that occurred on May 30, 2015. Tr. 595. The attending resident prescribed a patch and antibiotic ointment. *Id.* Mr. Romero presented ten more times to the UNM Eye Clinic over the next few months with ongoing complaints of photophobia, pain, sensitivity to touch, tearing, and headaches related to the corneal abrasion. Tr. 580, 581, 583, 584, 586, 588, 589, 592, 594, 571. On February 26, 2016, Mr. Romero reported that he was not having as much pain and was continuing to use his eye drops. Tr. 580. Ophthalmologist Amar Joshi indicated "[b]lind painful left eye 2/2 BB injury and recurrent [corneal] erosions." *Id.* Dr. Joshi recommended a left eye enucleation with implant. *Id.*

On March 7, 2016, Mr. Romero presented to the University of New Mexico Emergency Department complaining of worsening left eye pain, burning and redness. Tr. 567. Acute Care Nurse Practitioner Anne Kalunian diagnosed acute bacterial conjunctivitis. Tr. 569. Mr. Romero presented to the UNM Eye Clinic three days later, on March 10, 2016, and reported

continued left eye pain with photophobia. Tr. 577. Mr. Romero stated that the pain was severe at times. *Id.* Optometrist Randi Thompson prescribed drops and discussed enucleation. *Id.*

On October 2, 2016, Mr. Romero called the nurse advice line at UNM Hospital and reported a recurrent infection in his left eye from a chemical spray he used at work, with pain rated ten out of ten; he also reported experiencing "new onset of severe sensitivity to light or glare," reduced vision, tearing, and discharge. Tr. 605. On October 7, 2016, he presented to the UNM Emergency Department with increased left eye pain, redness, swelling around the orbital area, yellow drainage, and crusty in the morning. Tr. 565-66. CNP Frederick Blodgett diagnosed acute chemical conjunctivitis of the left eye, applied Tetracaine, and indicated Mr. Romero would follow up with ophthalmology. *Id.* On October 14, 2016, Mr. Romero presented to the UNM Eye Clinic and reported fluctuating and radiating left eye pain with photophobia and decreased discharge. Tr. 573. The treatment note indicates Mr. Romero will be seen again regarding enucleation once he was stable. *Id.* On October 21, 2016, Mr. Romero presented to the UNM Eye Clinic with complaints of left eye pain and swelling, with photophobia. Tr. 618. Mr. Romero reported that he had to quit his job due to photophobia. *Id.* The treatment note indicates that Mr. Romero wished to proceed with enucleation as his left eye pain and photophobia were affecting his ability to work. *Id.*

On February 9, 2017, Mr. Romero presented to the UNM Eye Clinic and reported constant left eye pain and irritation "for several years." Tr. 639. Ophthalmologist Dr. Joshi noted that Mr. Romero had previously canceled enucleation due to insurance issues, but was prepared to reschedule. Tr. 639. On March 29, 2017, Mr. Romero presented for a preoperative exam. Tr. 657, 668. On April 14, 2017, Mr. Romero underwent a left eye enucleation with ocular implant. Tr. 670-71.

Post-operatively, on April 28, 2017, Mr. Romero reported to his primary care provider, Dr. Aissa Steiner, that his vision was poor and causing him trouble at work. Tr. 645. Mr. Romero reported tripping two days prior and injuring his right wrist. Tr. 645. Dr. Steiner noted that spatial deficit was affecting Mr. Romero's work and that he was awaiting his eye prosthesis scheduled for June 7, 2017. *Id.* On June 28, 2017, Mr. Romero presented to UNM Eye Clinic and reported that he continued to have some left eye discharge but was adjusting to his new prosthesis. Tr. 704. On September 27, 2017, Mr. Romero reported to Dr. Steiner he continued to have left eye pain, recurrent infections, and related headaches. Tr. 774. On December 31, 2017, Mr. Romero reported to Dr. Steiner that he had been getting more headaches, that he "pulled out" his prosthetic eye and felt better, although it was still draining. Tr. 909. On June 28, 2018, Dr. Joshi referred Mr. Romero for "build up and e[n]largement of p[ro]sthetic eye and any future treatment that the Ocularis deems needed." Tr. 1023. Dr. Joshi scheduled Mr. Romero for a follow-up appointment on September 13, 2018. Tr. 1022.

2. **Depression**

Following the Administration's initial denial of Mr. Romero's applications, Mr. Romero reported at reconsideration on August 30, 2017, that since the removal of his left eye, he had been very depressed, had loss of energy and enthusiasm, and felt worthless most days. Tr. 254, 271, 437. The record indicates that on September 13, 2017, Field Officer Maritza Adame spoke with Mr. Romero to inquire whether he had been diagnosed with and received treatment for depression. Tr. 260-61, 277-78. Mr. Romero reported no to both, but explained that his sister would provide physician information. *Id.*

On September 27, 2017, Plaintiff saw both his primary care physician Dr. Steiner and LMSW Nancy Stringfellow and reported feeling down a few days out of the week, losing interest

in things, fatigue, poor sleep, and lack of concentration.  Tr. 725, 772.  Mr. Romero also reported

he was bothered with tendon pain from recent bilateral ulnar nerve decompression surgery and

ongoing pain related to his prosthetic eye.[12]  Tr. 725, 773-74.  They assessed a provisional

diagnosis of major depressive disorder, moderate, with no suicidal ideation.  *Id.*  Dr. Steiner

prescribed Duloxetine (20 mg.) for depression and pain and indicated that Mr. Romero would

continue to meet with behavioral health.  Tr. 772.

On October 11, 2017, Mr. Romero saw LMSW Stringfellow.  Tr 721.  She completed a

PHQ-9 Depression Test and assessed Mr. Romero with moderate depression (17 on the PHQ-9)

based on change in activity, fatigue, concentration issues, low/depressed mood, decreased

interest and pleasure in activities, and change in appetite.  *Id.*  LMSW Stringfellow noted that

Mr. Romero associated his depressed feelings with having a prosthetic eye, arthritis, and back

pain.  *Id*.  She also noted that Mr. Romero reported having experienced severe suicidal ideation

in the past, but that his current depression was not nearly as bad as it used to be.  *Id.*  Mr. Romero

reported that counseling had helped him in the past and he was not sure if the Duloxetine was

helping him now.  *Id.*  On the same date, Dr. Steiner noted that Mr. Romero's Duloxetine was

up to 40 mg. and he thought his mood was better.  Tr. 768.  Mr. Romero also reported poor sleep

and mind racing.  *Id.*  Dr. Steiner indicated that Mr. Romero's depression was stable with

improved mood.  *Id.*

On October 25, 2017, Mr. Romero saw Dr. Steiner and reported feeling more mellow and

not getting as angry, but having no improvement with pain and sleeping poorly.  Tr. 764.

Dr. Steiner noted that Mr. Romero's depression was "stable but not optimally controlled" and

---

[12] Dr. Steiner also noted arthritis of hand, carpal tunnel syndrome of right wrist, chronic worsening low back pain radiating to lateral thigh and some thoracic spasms, legal blindness, eye pain, recurrent infections, and headaches. Tr. 773-74.

increased his Duloxetine from 40 mg. to 60 mg.  *Id*.  Dr. Steiner also indicated that she was prepared to help Mr. Romero with his disability claim and had tried to reach his sister but had an incorrect phone number.  *Id.*

On December 13, 2017, Mr. Romero saw Dr. Steiner for ongoing care related to, *inter alia*, his depression.  Tr. 909-12.   Dr. Steiner noted that Mr. Romero reported increased anxiety, difficulty staying asleep and more headaches related to his prosthetic eye.  Tr. 909.  Dr. Steiner indicated that Mr. Romero's depression was stable, that he would continue counseling, and that Mr. Romero would follow up with her after counseling so she could consider adding medication for anxiety.  Tr. 910.

On January 3, 2018, Mr. Romero met with LMSW Marcela Trujillo.  Tr. 907.  LMSW Trujillo noted that Mr. Romero stated he would like to continue working on ways to reduce his symptoms of depression.  *Id.*  She noted on mental status exam that Mr. Romero seemed to have a difficult time with his memory.  *Id.*  Mr. Romero reported two recent deaths in his family and his mother's failing health.  *Id*.

On January 30, 2018, Mr. Romero presented to LISW Minda Jaramillo for counseling. Tr. 900.  Mr. Romero reported multiple medical issues that had become disabling and his frustration around not being able to function as before.  *Id.*  He reported spending most of his working years doing manual labor which had impacted him physically.  *Id.*  He also reported living with his parents and that it was becoming more difficult to care for them since his physical health is not well.[13]  *Id.*  Mr. Romero saw Dr. Steiner on the same date.  Tr. 901.   She noted, *inter alia,* that Mr. Romero's depression was heightened in setting of recent family/friend's poor

---

[13] Mr. Romero testified he lives in a small trailer at the back of his parents' property.  Tr. 200.

health.  Tr. 902.  She indicated that Mr. Romero would continue counseling, continue

Duloxetine, and that she would consider adjunct medications if necessary.  *Id.*

On February 13, 2018, Mr. Romero saw Dr. Steiner and reported depression and not

eating well.  Tr. 897.  Dr. Steiner indicated that Mr. Romero's mood was stable, that he liked

counseling, and that he should continue his medication.  *Id.*

On February 27, 2018, Mr. Romero met with LISW Jaramillo and reported he continued

to deal with chronic pain, multiple doctor appointments, and difficulty sleeping.  Tr. 893.  LISW

Jaramillo noted that Mr. Romero brought up the idea of using medical marijuana for pain

management and difficulty sleeping.  *Id.*  LISW communicated with Dr. Steiner who agreed to

have Mr. Romero do a trial of Trazadone.  *Id.*

On March 22, 2018, LISW Jaramillo completed an Adult Diagnostic Assessment related

to Mr. Romero's reported depression.  Tr. 145-52.  LISW Jaramillo summarized her assessment

in pertinent part as follows:

> Patient is a 53 year old Hispanic male who presents for assessment with concerns
> around depression.  Patient reports he experiences this "about 80% of the time" and
> tends to isolate when this happens.  He lives with his parents who he also helps take
> care of.  . . .  He struggled in school, was in special ed classes and continues to have
> difficulty in reading, writing and spelling.  He reports short term memory loss.
> Patient had his eye shot out by a BB gun when he was 10 years old and struggled
> in many life areas after that incident.  He has a PCP at FCCH and is linked to other
> providers for specialty needs in the community.  . . .  He presents as motivated to
> work through some of his depression and is currently prescribed 60 mg. of
> duloxetine daily which he feels is helping.

Tr. 152.  LISW Jaramillo diagnosed Unspecified Mental Disorder (does not meet full criteria for

a learning disorder but is very limited regarding reading and comprehension, writing and

spelling), and Unspecified Depressive Disorder.  *Id.*  She recommended that Mr. Romero attend

counseling to address issues around depressive symptoms, and planned to confer with Dr. Steiner

about the possibility of referring Mr. Romero for a neuropsychological evaluation.  Tr. 152.

On April 12, 2018, Mr. Romero met with LISW Jaramillo and reported continued pain. Tr. 1020. Mr. Romero stated that he continues to participate in activities for short periods of time, but then his pain takes over and he has to lie down. *Id.* Mr. Romero stated that he remains upset about not being able to do "the things I like to do" and would like to feel more useful. *Id.*

On April 25, 2018, Dr. Steiner discontinued Mr. Romero's Trazadone. Tr. 998.

Mr. Romero continued to see LISW Jaramillo monthly from May 1, 2018, through September 18, 2018, and reported ongoing complaints of pain. Tr. 121-30. On September 18, 2018, Mr. Romero decided he was ready to be discharged from counseling and reported feeling like his depression was being managed. Tr. 116. Dr. Steiner continued to prescribe Mr. Romero Duloxetine through May 12, 2019. Tr. 44, 95, 102, 105, 108, 111, 114.

On October 16, 2018, Mr. Romero testified that he was taking Duloxetine for his depression. Tr. 198. He testified that "I've got a lot of depression in myself right now." *Id.*

### B.    Relevant Evidence Regarding Mr. Romero's Ability to Read and Write

On January 26, 2017, Mr. Romero reported that he required assistance taking his medications by having someone read the labels.[14] Tr. 398. Mr. Romero explained it was because "I cannot see or read." *Id.* Mr. Romero also reported that he does not drive and cannot manage a checkbook because he cannot see, read or write. Tr. 399. Mr. Romero reported that cannot follow written instructions. Tr. 401.

On August 30, 2017, Mr. Romero reported to the Administration at reconsideration that

> I am through the help of my sister, who is typing this out for me going to explain
> why I should qualify for disability benefits. Below I will state in simple words
> what I am enduring and why I am appealing your decision and asking you to please

---

[14] Mr. Romero's sister testified that she reads Mr. Romero's prescriptions labels and puts his medications in a pill box that is labeled in different codes so that Mr. Romero knows what he is taking and knows how much and when to take his medications. Tr. 210.

reconsider.  Loss of Sight (Removal of Eye), Legally Blind, *Illiterate (Cannot read or write)*, Arthritis, Asthma, Lower back pain, Right leg pain.  Cannot operate moving equipment (vehicle, other).  *Cannot operate computers (cannot read, write or type).*  Dependance on sister to navigate the computer world.

Tr. 441 (emphasis added).

On December 13, 2017, Mr. Romero presented to Dr. Steiner for depression, lower back pain, and headaches.  Tr. 909-11.  Dr. Steiner, *inter alia,* encouraged Mr. Romero to do stretches for his chronic low back pain, which she demonstrated for him due to his "difficulty reading."  Tr. 910.

On March 22, 2018, LISW Jaramillo completed an Adult Diagnostic Assessment in which she noted that Mr. Romero was in special education due to his not being able to read or spell.  Tr. 146.  She further noted that "there are still times when [Mr. Romero] gets his words confused.  Doesn't remember being tested or diagnosed with a specific disability.  Does not read or write well.  Reports having short term memory loss issues."  Tr. 146.  She noted elsewhere that Mr. Romero continues to have difficulty in reading, writing and spelling.  Tr. 152.  LISW Jaramillo diagnosed Mr. Romero with an unspecified mental disorder, noted he was very limited regarding reading and comprehension, writing and spelling, and wanted to refer Mr. Romero for a neuropsychological evaluation.[15]  *Id.*

On October 16, 2018, Mr. Romero testified that he does not know how to read or write.  Tr. 204.  On the same date, Mr. Romero's sister also testified that Mr. Romero cannot read or write.  Tr. 209.  She further testified that he cannot use any type of technology, cannot read text messages, and cannot read prescription labels.  Tr. 209-10.

---

[15] After Mr. Romero's applications were denied at reconsideration, Mr. Romero requested, on November 15, 2017, a hearing by an Administrative Law Judge.  Tr. 306-07.  On that same date, Mr. Romero reported to the Social Security Administration that Dr. Steiner had referred him for a neuropsychological evaluation, that he was on a waiting list, and that the process for services was lengthy.  Tr. 453.

### C.  Relevant Medical Opinion Evidence

#### 1.  Sandra McBride, M.D.

On May 27, 2017, Mr. Romero presented to Sandra McBride, M.D., for a consultative

physical examination.  Tr. 691-97.  Dr. McBride took Mr. Romero's histories related to his back

problems, arthritis, and vision problems.  Tr. 691-92.  She also took his past medical, surgical,

medication, social and family histories.  Tr. 692.  Dr. McBride conducted a physical exam and

summarized in pertinent part that

> [t]here are some relevant visual limitations as the claimant does have a left
> enucleation and is awaiting permanent prosthetic.  Visual fields are significantly
> limited because of this.  The claimant also reports anger management issues.  He
> may benefit from a psychological evaluation as I cannot comment further on how
> this may possibly limit or affect his ability in the workplace environment with day-
> to-day interactions with colleagues.

Tr. 696-97.  Dr. McBride assessed functional limitations, including that Mr. Romero had

visual limitations due to decreased visual acuity and left eye prosthesis.  Tr. 697.

#### 2.  Barbara Abercrombie, M.D.

On June 29, 2017, nonexamining State agency medical consultant Barbara

Abercrombie, M.D., reviewed the medical evidence record at the initial level of review.[16]

Tr. 234-36, 246-48.  Based on her review of the medical evidence record,

Dr. Abercrombie assessed that Mr. Romero could perform a reduced range of light work.

*Id.*  In particular, Dr. Abercrombie assessed, *inter alia,* that Mr. Romero would have

visual limitations of limited near and far acuity and limited accommodation based on his

left eye blindness.  Tr. 235, 247.

---

[16] Dr. Abercrombie reviewed Mr. Romero's Function Report, Dr. McBride's May 27, 2017 consultative examination report, and four UNM medical records concerning bilateral hand tingling, left eye pain, reduced vision, and right shoulder pain.  Tr. 236, 248.

### 3. <u>Susan Clifford, M.D. (Tr. 264-67)</u>

On September 24, 2017, nonexamining State agency medical consultant Susan Clifford, M.D., reviewed the medical evidence record at reconsideration.[17]  Tr. 264-67, 280-84. Dr. Clifford assessed that Mr. Romero could perform a reduced range of light work.  *Id.*  In particular, Dr. Clifford assessed, *inter alia,* that Mr. Romero had visual limitations including limited near and far acuity, limited accommodation, and limited field of vision due to his left eye blindness.  Tr 265-66, 282-83.

### 4. <u>Susan Daugherty, Ph.D.</u>

On September 20, 2017, nonexamining State agency psychological consultant Susan Daugherty, Ph.D., reviewed the medical evidence record and prepared an abbreviated Psychiatric Review Technique ("PRT"),[18] in which she concluded that Mr. Romero had no established mental medically determinable impairments and that no established mental medically determinable impairments that caused marked limitations in Mr. Romero's activities of daily living.  Tr. 262, 279.  Dr. Daugherty noted that Mr. Romero had reported becoming depressed since his eye enucleation, but that "[p]er TC with clmt he has never been dx with any mental condition and is not taking any medication for mental health."  *Id.*

---

[17] Dr. Clifford similarly reviewed Mr. Romero's Function Report, Dr. McBride's May 27, 2017 consultative examination report, and four UNM medical records concerning bilateral hand tingling, left eye pain, reduced vision, and right shoulder pain.  Tr. 266, 283.  She also reviewed additional medical records from UNM regarding Mr. Romero's corneal scarring, enucleation, eye prosthesis, and hand-related joint osteoarthritis.  Tr. 267, 284.

[18] "The psychiatric review technique described in 20 CFR §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

### D. The ALJ's RFC Assessment Fails To Properly Account for Mr. Romero's Nonexertional Impairments

Assessing a claimant's RFC is an administrative determination left solely to the Commissioner "based on the entire case record, including objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (an individual's RFC is an administrative finding).[19] In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2) and (3), 416.945(a)(2). The ALJ must consider and address medical source opinions and give good reasons for the weight accorded to a treating physician's opinion. 20 C.F.R. §§ 404.1527(b), 416.927(b)[20]; SSR 96-8p, 1996 WL 374184, at *7. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184 at *7. Further, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7). When the ALJ fails to provide a narrative

---

[19] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

[20] The rules in this section apply for claims filed *before* March 27, 2017. 20 C.F.R. §§ 404.1527, 416.927.

discussion describing how the evidence supports each conclusion with citations to specific medical facts and nonmedical evidence, the court will conclude that his RFC assessment is not supported by substantial evidence. *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003) (unpublished).

### 1. <u>Visual Impairment</u>

Mr. Romero argues that the ALJ failed to properly consider Mr. Romero's visual impairment when assessing his residual capacity to do work-related activities and improperly concluded that Mr. Romero's visual impairment only limited him with respect to his peripheral vision and depth perception. Doc. 21 at 11-12. Mr. Romero further argues that the two jobs the VE identified, bakery worker and counter clerk, require that Mr. Romero work in occasional proximity to moving mechanical parts with exposure to possible bodily injury as to the former and that Mr. Romero use near acuity frequently as to the latter. *Id.*

The Commissioner argues that the ALJ considered the limited medical record concerning Mr. Romero's vision impairment and included limitations in the RFC that were commensurate with the record. Doc. 23 at 9.

An ALJ is required to consider the effect of a claimant's medically determinable impairments on his residual capacity to perform work-related activities and must explain how the evidence supports her conclusions. *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7). SSR 96-8p further instructs that nonexertional capacity, just like exertional capacity, must be expressed in terms of work-related functions. SSR 96-8p, 1996 WL 374184, at *6. In particular, this ruling states that

> [f]or example, in assessing RFC for an individual with a visual impairment, the adjudicator must consider the individual's residual capacity to perform such work-

related functions as working with large or small objects, following instructions, or avoiding ordinary hazards in the workplace.

*Id*. SSR 83-14 discusses the combination of light physical exertion with nonexertional impairments and provides in pertinent part that

> [w]here a person has a visual impairment which is not of Listing severity but causes the person to be a hazard to self and others - usually a constriction of visual fields rather than a loss of acuity - the manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work (and medium work as well).

SSR 83-14, 1983 WL 31254, at *5.

It is undisputed that Mr. Romero is blind in his left eye. It is also undisputed that *all* of the medical opinion evidence addressing Mr. Romero's left eye blindness is consistent in that Mr. Romero has certain nonexertional visual limitations as a result of his visual impairment. For example, Dr. Abercrombie assessed that Mr. Romero would have limited near and far acuity and limited accommodation due to the blindness in his left eye.[21] Tr. 235, 247. Dr. Clifford assessed that Mr. Romero would have limited near and far acuity, limited accommodation, and limited field of vision due to his left eye blindness. Tr. 265-66, 282-83. Dr. McBride assessed that Mr. Romero's "[v]isual fields are significantly limited" because of his left eye blindness. Tr. 696-97. Additionally, Mr. Romero testified that he tends to fall a lot (Tr. 196), and reported falls related to his visual impairment to his medical providers on multiple occasions, *i.e.,* had a fall at work after tripping due to poor vision and what Dr. Steiner described as "spatial deficit" (Tr.

---

[21] Accommodation is the ability of the eye to change its focus from distant to near objects (and vice versa). https://www.medicinenet.com/accommodation/definition.htm. This process is achieved by the lens changing its shape. Id. Accommodation is the adjustment of the optics of the eye to keep an object in focus on the retina as its distance from the eye varies. It is the process of adjusting the focal length of a lens. *Id.*

645); fell over a basket at home when feeding dog (Tr. 897); fell from a ladder because he missed the last two steps (Tr. 125). Yet despite the undisputed fact of Mr. Romero's left eye blindness, the uncontradicted medical opinion evidence regarding his visual limitations, *i.e.,* limited near and far acuity and limited accommodation, Mr. Romero's testimony, and medical record evidence that supports a constriction of his visual fields, the ALJ, without any legitimate explanation,[22] concluded that Mr. Romero's only visual limitations are that he has no peripheral vision on the left and has no depth perception.

Further, the ALJ's discussion of the evidence fails to demonstrate how the evidence supports her conclusion. For example, the ALJ discusses that Mr. Romero's enucleation and prosthesis placement occurred without complications and that certain exams noted "good" left eye prosthetic. Tr. 21. The ALJ also discussed that eye exams demonstrated Mr. Romero's right eye had uncorrected vision, was functioning well, and that none of his providers noted any visual deficits that hindered or prevented the completion of any eye, or other, exam. Tr. 21-22. Notably, however, the ALJ's discussion fails to connect how the purported success of surgically removing Mr. Romero's left eye and replacing it with a prosthetic eye supports the ALJ's assessed visual limitations. In other words, whether the enucleation of Mr. Romero's left eye and placement of a prosthetic eye occurred without complications or not fails to address the

---

[22] The ALJ accorded some weight to the opinions of Dr. Abercrombie and Dr. Clifford and explained as to their assessed visual limitations, without more, that their opinions were "vague as to visual limitations." Tr. 24. The Court, however, is not persuaded that their assessed visual limitations are "vague." To the contrary, assessing limited near and far acuity, limited accommodation, and limited field of vision is quite specific. The ALJ also accorded some weight to Dr. McBride's opinion again explaining, without more, that her opinion was vague as to Mr. Romero's visual limitations. Tr. 25. The Court is also not persuaded by the ALJ's explanation for discounting Dr. McBride's assessment. Although Dr. McBride did not identify each area of visual field, *i.e.,* near acuity, far acuity, depth perception, accommodation, color vision, and field of vision, Dr. McBride was nonetheless very clear that Mr. Romero's visual fields are *significantly limited.* Moreover, having accorded their opinions *some* weight, the ALJ failed to incorporate any of the visual limitations assessed by Dr. Abercrombie, Dr. Clifford, or Dr. McBride. See *Sitsler v. Barnhart,* 182 F. App'x 819, 823 (10th Cir. 2006) ("SSR 96–8p requires that medical source opinions must always be considered and addressed by the ALJ in the RFC assessment, and if it conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted.")

proper inquiry, *i.e.,* the extent of Mr. Romero's visual limitations as a result of his permanent left eye blindness. Additionally, it is not clear to the Court at all how the absence of provider notes indicating that visual deficits hindered or prevented the completion of an exam amounts to substantial evidence to support the ALJ's assessed visual limitations or explains why she did not adopt the assessed limitations set forth in the uncontradicted medical opinion evidence. "The absence of evidence is not evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993); *see also Sitsler v. Barnhart*, 182 F. App'x 819, 823 (10th Cir. 2006) ("SSR 96–8p requires that medical source opinions must always be considered and addressed by the ALJ in the RFC assessment, and if it conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted.").

In sum, the ALJ failed to properly consider the effect of Mr. Romero's visual impairment on his ability to do work-related activities based on all of the evidence and failed to describe how the evidence supports her conclusions regarding Mr. Romero's visual limitations. The ALJ's failure to do so in this case is of particular concern given the visual demands of the two jobs the VE identified.[23] The job of counter clerk, DOT 249.366-010, requires frequent near acuity.[24] The job of bakery worker, DOT 524.687-022, requires occasional near acuity, occasional accommodation, and occasional proximity to moving mechanical parts.[25]

## 2. <u>Depression and Inability to Read and Write</u>

Mr. Romero argues that the medical record evidence supports that he suffered from and was being treated for depression and that consultative examiner Dr. McBride recommended a

---

[23] The VE testified that the only jobs she was familiar with that have only occasional handling and finger and have the vision requirements the ALJ assessed were counter clerk and bakery worker. Tr. 216.

[24] *See* Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (1993), p. 333.

[25] *Id.* at p. 299.

psychological evaluation based on his anger management issues. Doc. 21 at 10-11. Mr. Romero also argues that he has problems with reading and writing. *Id.* For these reasons, and because Mr. Romero was not represented by an attorney at the hearing, Mr. Romero argues the ALJ had a duty to develop the record as to these material issues affecting his ability to do work-related activities and that she failed to do so. *Id.*

The Commissioner contends that the ALJ was not required to order a psychological consultative examination because the record showed that Mr. Romero received medication and counseling that were sufficient to stabilize his symptoms. Doc. 23 at 8-9. As such, the Commissioner contends the ALJ was able to make findings with respect to Mr. Romero's ability to do work-related mental activities based on the record and without requiring additional evidence.

With regard to Mr. Romero's mental impairments, the claimant bears the burden of proving that he is disabled. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). However, administrative hearings are non-adversarial and the ALJ is responsible for developing an adequate record on the issues raised. *Id.* This duty is "heightened" when the claimant is not represented by an attorney. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). To trigger the duty of inquiry, "the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997) (citations omitted). While "[t]he duty of inquiry takes on special urgency when the claimant ... is unrepresented by counsel," *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987), the ALJ is not required to "exhaust every potential line of questioning," *Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994). " 'The ALJ should order a consultative exam when evidence in the record establishes a *reasonable possibility* of the

existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability.' " *Madrid*, 447 F.3d at 791 (quoting *Hawkins*, 113 F.3d at 1169) (emphasis in original).

The Commissioner "has broad latitude in ordering consultative examinations." *Barrett v. Astrue*, 340 F. App'x 481, 486 (10th Cir. 2009) (unpublished) (quoting *Hawkins*, 113 F.3d at 1166).[26] When a claimant contends that the ALJ erred in failing to obtain a consultative examination, the Court is presented with the difficult issue of "decid[ing] what quantum of evidence a claimant must establish of a disabling impairment or combination of impairments before the ALJ will be required to look further." *Id.*

> The difficult cases are those where there is *some* evidence in the record or *some* allegation by a claimant of a possibly disabling condition, but that evidence, by itself, is less than compelling.... Our review of the cases and the regulations leads us to conclude that the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation. ... Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment.

*Id.* at 1167 (citations omitted) (emphasis in original.) "Ordinarily, the claimant must in some fashion raise the issue sought to be developed, ... which, on its face, must be substantial." *Hawkins*, 113 F.3d at 1167 (citations omitted).

> [T]he claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists. When the claimant has satisfied his or her burden in that regard, it then, and only then,

---

[26] In *Barrett*, the claimant argued the ALJ should have obtained a consultative psychological exam alleging that the medical evidence was inconclusive regarding the effects of his alleged disabling mental impairments. 340 F. App'x at 486. The claimant argued that he had a history of suicide attempts, special education classes, taking antidepressant medication, and that he testified that his wife filled out his disability forms on his behalf because he did not understand them, and that she commented therein that he had difficulty following oral and written instructions. *Id.* The Court was not persuaded and noted the record evidence regarding Mr. Barrett's daily activities and physical abilities, the medical consultant's PRT and MRFCA assessment findings, and that medication controlled the claimant's depression. *Id.* at 487. The Court further explained that the claimant's wife's comments were isolated and unsupported and were insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment. *Id.* The Court held the ALJ did not err in failing to obtain a consultative psychological exam. *Id.*

> becomes the responsibility of the ALJ to order a consultative examination if such
> an examination is necessary or helpful to resolve the issue of impairment.

*Id.* The court in *Hawkins* identified three instances when such an examination is often required: "where there is a direct conflict in the medical evidence"; "where the medical evidence is inconclusive"; and "where additional tests are required to explain a diagnosis already contained in the record." *Id.* at 1166; *see also* 20 C.F.R. § 416.919a (describing when the Administration will purchase a consultative examination).

The Court finds that the evidence of record establishes a reasonably possibility that a psychological consultative exam could be of material assistance in resolving the issue of Mr. Romero's disability. *See Madrid*, 447 F.3d at 791. First, Mr. Romero raised the issue of his depression at reconsideration and presented medical evidence sufficient to suggest a reasonable possibility that a severe impairment exists.[27] Second, the only medical source opinion evidence on the issue of Mr. Romero's depression is from Dr. Daugherty. However, at the time Dr. Daugherty reviewed the medical evidence record at reconsideration and rendered her opinion that Mr. Romero had no established mental medically determinable impairments and no mental medically determinable impairment causing *marked limitations* in activities of daily living, Mr. Romero had not yet been diagnosed with or begun treatment for his depression. As such, Dr. Daugherty did not have the benefit of reviewing the medical record evidence that established Mr. Romero's diagnosis of and treatment for depression, and did not prepare a complete PRT or a Mental Residual Functional Capacity Assessment[28] as part of her medical evidence record review. Third, Dr. McBride, who conducted a consultative physical exam, stated that

---

[27] *See* Section III.A.2., *supra*.

[28] The MRFCA form is used to assess an individual's ability to perform sustained work-related mental activities, *i.e.,* what an individual can do despite his impairment. *See* DI 24510.060.

Mr. Romero may benefit from a psychological exam based on his anger management issues. Fourth, there is substantial evidence in the record regarding Mr. Romero's inability to read and write,[29] and that his mental healthcare providers wanted him referred for a neuropsychological evaluation based on diagnoses of unspecified mental disorder and unspecified depressive disorder.[30] Fifth, Mr. Romero was not represented by counsel at the Administrative Hearing.[31] The ALJ, therefore, had a heightened duty for developing an adequate record.

For these reasons, the Court finds that the ALJ failed to develop an adequate record related to Mr. Romero's mental impairments. On remand, the ALJ will order a consultative psychological examination from an appropriate source.

This error aside, the Court finds that the ALJ also failed to properly consider Mr. Romero's nonexertional mental impairments in assessing the RFC. As an initial matter, it is difficult for the Court to follow the ALJ's reasoning. On the one hand, the ALJ, at step two, discounted the record evidence of Mr. Romero's mental health treatment and found Mr. Romero's depression and learning disorder to be non-severe.[32] Tr. 16-17. On the other

---

[29] *See* Section III.B., *supra.*

[30] The ALJ rejected evidence that Mr. Romero could not read or write based solely on his having obtained a high school diploma. This was improper. *See Heldenbrand v. Chater*, 132 F.3d 36 (Table), 1997 WL 775098, at *4 (7th Cir. 1997) (finding it was improper for an ALJ to simply guess whether a high school graduate can also be illiterate and that the Department of Education has released studies demonstrating that 16 to 20% of all adults with high school diplomas perform in the lowest literacy level); *see also* SSR 82-63, 1982 WL 31390, at *4 (explaining that . . . the level of formal education is not conclusive of a person's vocational competence. . . . [A] person may have attended school beyond the sixth grade, but other evidence may establish capability for reasoning, arithmetic, and language which does not, in fact, exceed the "marginal" criterion.); *see generally* 20 C.F.R. 404.1562(a) (explaining that if a claimant has no more than a marginal education and work experience of 35 years of more during which the claimant did only unskilled physical labor and is not working and no longer able to do this kind of work because of severe impairment, the Administration will consider the claimant unable to do lighter work and, therefore, disabled).

[31] *See* fn. 7, *supra.*

[32] The ALJ cites to 54 records to support her step two finding that Mr. Romero's mental status findings were essentially normal and that Mr. Romero was only mildly limited in his ability to do work-related functions. Tr. 17. However, the Court's review of each record cited demonstrates that 25 of the records cited *predate* Mr. Romero's diagnosis of depression; 16 of the records cited are otherwise irrelevant to Mr. Romero's depression (New Mexico Orthopaedics, Lovelace After Visit Summaries, Trigger Point Injections for Back Pain); 4 of the records cited actually relate to only

hand, the ALJ, at step four, accorded less weight to Dr. Daugherty's opinion because she failed to recognize that the record supported a mental medically determinable impairment, *i.e.,* "opining that the claimant does not have a mental medically determinable impairment is not consist[ent] with the record, including the claimant attending outpatient mental health counseling." Tr. 25. *See Spicer*, 64 F. App'x at 177-78 (ALJ's decision must be sufficiently articulated so that it is capable of meaningful review). More significantly, however, the Court notes that having found Mr. Romero's depression and learning disorder to be non-severe at step two, the ALJ failed to consider Mr. Romero's mental impairments at all when assessing his RFC

---

2 irrelevant treatment notes (predate depression and back pain); and 1 record does not exist at all (18F/8). Of the 54 records cited, only six address Mr. Romero's diagnosis of and treatment for depression. Tr. 721, 725, 764, 768, 774, 909. However, missing from the 54 cited records is any mention of the Adult Diagnostic Assessment related to Mr. Romero's mental impairments, any discussion of Mr. Romero's mental counseling records, or an acknowledgement of Mr. Romero's medication therapy for depression. "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)); *see also Clifton,* 79 F.3d at 1009 (the record must demonstrate that the ALJ considered all of the evidence and must discuss the uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejects).

The ALJ also discounted Mr. Romero's alleged mental impairments because he graduated from high school with a regular diploma, did not have a valid driver's license due to unpaid child support, reported no problems getting along with others, including authority figures, and had never been fired from a job due to problems of getting along with people. Tr. 16. She also explained that Mr. Romero was able to attend to his personal care, use a microwave to heat up his food, could do light chores, was able to take his medications using the pillbox prepared by his sister, watched television, shopped in stores, spends times with others, and attends doctor appointments. Tr. 16-17. Lastly, the ALJ explained that Mr. Romero had not reported any difficulty in avoiding certain hazards like avoiding cars while crossing a street and had not reported any difficulty with dealing with changes such as a changed appointment time. Tr. 17. However, the specific facts behind these generalities paint a very different picture. *See generally Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ). For instance, the ALJ improperly concluded that the issuance of a high school diploma ensures literacy, *see* fn. 30, *supra*, and ignored the substantial evidence related to Mr. Romero's inability to read and write. *See* Section III.B, *supra*. The ALJ failed to note that Mr. Romero had unpaid child support due to his inability to work and also did not drive due to his visual impairment and inability to read signs. Tr. 201, 209, 399. Mr. Romero testified that he is essentially unable to do household chores; however, his sister testified that he could do "light" chores such as if he sits he can fold laundry, but is unable to put it away. Tr. 203, 211. Mr. Romero also testified that if he goes to a store with a family member, he uses an electric cart. Tr. 202. Mr. Romero testified that when he watches television, he needs several pillows to support him. Tr. 206-07. As for spending time with others, Mr. Romero reported that he spends time with the family members upon whom he depends for assistance in caring for himself. Tr. 400. Lastly, it is not clear to the Court how Mr. Romero's being an agreeable person is a basis for discounting the impact of his depression and learning disorder on his ability to do work-related activities, or how Mr. Romero's alleged failure to report certain difficulties as suggested in the ALJ's hypotheticals amounts to substantial evidence. "The absence of evidence is not evidence." *Thompson*, 987 F.2d at 1491.

at step four.  *See Wells*, 727 F.3d at 1068-69 (holding that "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five."); *see also* SSR 96-8p, 1996 WL 374184, at *6 (directing that nonexertional capacity must be expressed in terms of work-related functions).  *Wells*, 727 F.3d at 1068-69.  This is error.

For these reasons, the Court finds the ALJ also failed to properly consider Mr. Romero's mental impairments when assessing his RFC.  As such, this case requires remand.

### E.    Remaining Issues

The Court will not address Mr. Romero's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### F.    The Court Will Remand for Additional Administrative Proceedings

District courts have discretion to remand either for further administrative proceedings or for an immediate award of benefits.  *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). In making this decision, courts should consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits.'"  *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (quoting *Harris v. Sec'y of Health & Human Servs*., 821 F.2d 541, 545 (10th Cir. 1987)).  When the Commissioner has failed to satisfy her burden of proof at step five, and when there has been a long delay as a result of her erroneous disposition of the proceedings, remand for an immediate award of benefits may be appropriate.  *Ragland*, 992 F.2d at 1060 (remanding for an immediate award of benefits "[i]n light of the Secretary's patent failure to satisfy the burden of proof at step five, and the long delay that has already

occurred as a result of the Secretary's erroneous disposition of the proceedings"). The Commissioner "is not entitled to adjudicate a case *ad infinitum* until [she] correctly applies the proper legal standard and gathers evidence to support [her] conclusion." *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 746 (10th Cir. 1993) (quoting *Thaete v. Shalala*, 826 F. Supp. 1250, 1252 (D. Colo. 1993)).

Here, Mr. Romero requested an immediate award of benefits based on the ALJ having identified only 8,300 jobs in the national economy. The Court, however, having found other grounds for remand did not address this argument. Additionally, there is no evidence that this case has been unnecessarily delayed, and the Court is not persuaded that remand for additional fact-finding would merely delay the inevitable receipt of benefits. The Court, therefore, is remanding for additional administrative proceedings.

**IT IS SO ORDERED.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding By Consent**